MASSACHUSETTS HOSPITAL SERVICE, INC. & others *vs.*
COMMISSIONER OF ADMINISTRATION.

Suffolk.   May 3, 1966. — June 29, 1966.

Present: SPALDING, WHITTEMORE, KIRK, & REARDON, JJ.

*Hospital Service Corporation. Hospital. Words,* "Reasonable hospital costs."

The provision of G. L. c. 176A, § 5, that rates of payment by a hospital service corporation to a participating hospital must "reflect reasonable hospital costs or . . . [be] based on charges made to the general public, whichever is lower," does not preclude a formula for reimbursing the hospital for "special services," such as laboratory tests, calculated without regard to whether such services are furnished to in-patients or out-patients or whether the subscribers to whom such services are furnished have a limited form of coverage known as "indemnity coverage" or "comprehensive coverage."   [255–260]

G. L. c. 176A, § 5, does not preclude inclusion of cost of care of "medically indigent" persons in a hospital as a cost factor in determining the amounts reimbursable to the hospital by a hospital service corporation for in-patient care furnished to subscribers having "comprehensive coverage."   [261–263]

BILL IN EQUITY filed in the Supreme Judicial Court for the county of Suffolk on March 5, 1965.

The suit was reserved and reported by *Spalding,* J., without decision.

*John M. Harrington, Jr.* (*Charles J. Dunn & Edward B. Hanify* with him) for Massachusetts General Hospital & others.

*Herbert P. Wilkins* for Massachusetts Hospital Service, Inc.

*David W. Hays,* Assistant Attorney General, for the respondent.

SPALDING, J.  This is a bill seeking declaratory relief against the Commissioner of Administration of the Commonwealth (commissioner).  It was brought by the Massachusetts Hospital Service, Inc., commonly known as and hereinafter referred to as Blue Cross, and by the Massachusetts General Hospital, The Beth Israel Hospital Association, St. Vincent Hospital, Winchester Hospital, Brockton Hospital Company and the Springfield Hospital.  The bill seeks a binding declaration that certain portions of the existing hospital reimbursement agreement between Blue Cross, and both the hospitals named in the bill and other hospitals in the Commonwealth are valid under the provisions of G. L. c. 176A.  The case was reported without decision by the single justice.  The record consists of a statement of agreed facts, the present agreement, past agreements, letters from the present and former commissioners, and certain documents.

Blue Cross is a nonprofit hospital service corporation formed under G. L. c. 176A.  It has periodically entered into hospital reimbursement agreements with various hospitals throughout the Commonwealth, whereby in consideration of the promise of a participating hospital to furnish hospital services to Blue Cross subscribers, Blue Cross agrees to make payments for those services to the hospitals.  The mode of determining rates of payment is set forth in these agreements which must be approved by the commissioner before any Blue Cross payments are made pursuant to these rates.  G. L. c. 176A, § 5.  The hospitals "include voluntary (non-profit) hospitals . . . municipal

. . . proprietary . . . and certain state and county hospitals.'' Certain portions of the most recent of these agreements between Blue Cross and the hospitals are the subject of this bill.

''Blue Cross provides benefits for hospital and other health services pursuant to certificates or contracts which are purchased by . . . [its] subscribers.'' While certain subscribers are enrolled directly with Blue Cross, others are enrolled as members of groups made up for the most part of subscribers having a common employer. ''Blue Cross benefits are normally available for hospital services rendered only in Massachusetts hospitals which have executed hospital agreements with Blue Cross . . . [and] [b]enefits are available in Massachusetts non-participating hospitals only under limited circumstances.''

Over fifty per cent of the residents of the Commonwealth are currently Blue Cross members, and they account for approximately fifty per cent of the patient days in Massachusetts hospitals. The basic benefits offered the subscriber include payment toward the charges of the hospital for ''accommodations,'' which are services such as room, board, and routine nursing care.[1] If a subscriber has indemnity coverage, his benefits for accommodations are limited to a specific dollar amount, depending upon the subscription charge paid, and he is liable to the hospital for any charges for accommodations which exceed that amount. If, on the other hand, a subscriber contracts for comprehensive coverage, his full charges for accommodations are paid so long as he stays in a ward or semi-private room. In addition to its basic coverage, Blue Cross offers two other types of coverage, the details of which need not concern us.

''Special services are services other than those routinely furnished as part of accommodations,'' and include such things as laboratory tests, drugs, use of operating rooms, medical supplies and the use of medical equipment. ''In each subscriber's certificate Blue Cross provides (with one

---

[1] In hospital accounting practices, ''accommodations'' are called ''routine services.''

minor exception) that any member is entitled to full credits for any special services furnished . . . [him] in a participating hospital (up to a stated number of days if the member is an in-patient). . . . Many items of hospital care which fall within special services covered by Blue Cross might be and are furnished either on an in-patient or an out-patient basis.'' An in-patient is furnished lodging while receiving care or services in a hospital, whereas an out-patient is not accommodated in this manner.

General Laws c. 176A, § 5, sets forth the standard by which hospital reimbursement agreements are to be measured. It reads in part: ''All rates of payments to hospitals made by such corporations, under such contracts, shall be approved in advance by the commissioner of administration. . . . Any such approval may be withdrawn by the commissioner at any time. No rates of payment shall be approved, or their continuance be permitted, by the commissioner unless such rates reflect reasonable hospital costs or are based on charges made to the general public, whichever is lower. The commissioner in determining reasonable cost shall give consideration to services provided by the hospital and the costs of comparable hospitals, and may give consideration to depreciation, amortization, interest, occupancy, and individual services which are rendered for partial or no payment.''

In December, 1964, the former commissioner approved the agreement currently in effect between Blue Cross and the hospitals. In granting his approval he issued a letter, which is in evidence, setting forth his reasons. In January of 1965, the present commissioner (defendant here) took office. In March, 1965, he notified Blue Cross and the Massachusetts Hospital Association that the agreement now in effect does not comply with the requirements of G. L. c. 176A, § 5, in two respects. He stated that the provisions in the agreement providing for the ''joining of out-patient costs and charges with the respective costs and charges of in-patient hospital special service departments produces a rate of payment which does not comply with that

portion of G. L. c. 176A, § 5 which requires that [such] rates of payment 'reflect reasonable hospital costs' or be 'based on charges made to the general public, whichever is lower.' " This aspect of the agreement has been denominated by parties as the "merger" provisions and will hereinafter be referred to as such in this opinion. The commissioner's second objection was directed at the inclusion of the net cost of care of medically indigent as an element of cost to be reflected in determining a hospital reimbursement rate. The commissioner stated that as a "matter of law, hospital costs incurred in rendering care to persons . . . unable to pay all or part of the charges of the hospital for the services furnished to them may not be included in determining reasonable hospital costs under G. L. c. 176A, § 5."

I

### The Merger Provisions.

Under "all prior agreements, a reimbursement method for use in determining payment to the hospitals by Blue Cross for special services was determined separately for in-patient and out-patient services." For example, since October 1, 1962, Blue Cross has paid a percentage (never over 100%) of a hospital's charges for covered services furnished a Blue Cross member in an out-patient department. Until the present agreement went into effect, that percentage was determined from the ratio of " (a) all out-patient costs incurred by the hospital (including the costs of clinics, services of residents, interns, nurses and other out-patient department personnel) to (b) all of the hospital's charges for out-patient services." The costs and charges used in this determination were those for out-patient care furnished all patients, not just member patients.

Amounts reimbursed for special services furnished in-patients were determined separately in the past for indemnity members and for comprehensive members. For services rendered to comprehensive members, rates of reimbursement were calculated together with rates for accommodations. For services rendered to indemnity members,

payments for special services were determined separately and were based upon "the lower of costs or charges from the composite costs of all special service departments furnishing services to in-patients and the composite charges of all such departments."[2]

The merger provisions of the present agreement provide "a single payment procedure for special services rendered by a participating hospital without regard to whether the special service is furnished to an in-patient or out-patient . . . [or] whether the member has indemnity or comprehensive coverage." A single percentage,[3] never to exceed 100%, is derived from the ratio of the total hospital costs of special services for certain prior fiscal years to the hospital's charges for special services for those fiscal years. Payments to the hospitals are then determined by applying this percentage to those charges of Blue Cross members for special services for which Blue Cross is responsible.

To illustrate the impact of the merger provisions, the parties have set forth an illustration (reproduced below) of a "common hospital cost-charge ratio for both in-patient and out-patient special services." In this illustration, which apparently reflects the situation in many hospitals, "in-patient charges exceed costs and out-patient costs ex-

---

[2] Paragraph 30 of the stipulation reads: "Under the immediately preceding hospital agreement . . . the Blue Cross payment (on a final settlement basis) for in-patient special services rendered to Blue Cross members during each hospital fiscal year *was* determined by multiplying the lower of (a) the hospital's Blue Cross per diem costs for special services or (b) its per diem charges to Blue Cross members for special services by the number of Blue Cross non-comprehensive patient days in the hospital. To arrive at the Blue Cross per diem cost of in-patient special services, the total cost of furnishing services to in-patients in special service departments (anesthesiology, laboratory, radiology, operating room, etc.) were allocated to Blue Cross in the ratio of (a) the total charges to Blue Cross members including comprehensive members in that department to (b) the total charges to all patients in the department. . . . The departmental costs allocated to Blue Cross were totaled and the total divided by the number of Blue Cross in-patient days (including comprehensive) to produce a Blue Cross special service per diem cost. This amount, adjusted by a factor for depreciation and other expenses, was then compared with the per diem charges to Blue Cross non-comprehensive in-patients for special services during the fiscal year and the lower was selected to be multiplied by the number of Blue Cross non-comprehensive in-patient days to produce the amount due to the hospital."

[3] The percentage is referred to in the agreement as "The Special Services Payment on Account Factor."

ceed charges." In studying this illustration, it is important to keep in mind that for "all like special services performed by . . . [a] hospital, charges to Blue Cross patients are the same as charges to the general public."

[Illustration]

|  | "In-patient Special Services (including New Born Special Services) | Out-patient Special Services (including Routine Out-patient Services) |
|---|---|---|
| Total costs | $400,000 | $100,000 |
| Total charges | $500,000 | $80,000 |
| Charges with respect to Blue Cross patients | $300,000* | $40,000*" |

"*Under the present agreement there is no specific provision for making a separate determination of in-patient special service costs with respect to Blue Cross patients and out-patients special service costs with respect to Blue Cross patients."

"Assuming that the present agreement were in effect without the 'merger' provisions and reimbursement for special services were determined separately for in-patient and out-patient special services . . ., Blue Cross would in the above situation reimburse 80% $\frac{[\$400,000]}{500,000}$ of in-patient charges and 100% $\frac{[\$100,000}{80,000}$ but never to exceed 100%] of out-patient charges to . . . members for special services covered by Blue Cross." Total reimbursement would thus amount to $280,000; $240,000 for covered in-patient services and $40,000 for covered out-patient services.[4] Under the

---

[4] Paragraph 48 of the stipulation reads: "For the purpose of making a comparison between reimbursement for special services under the present agreement and under the immediately preceding agreement, Blue Cross in-patient special service costs under the prior agreement might be in the range of $235,000 to $245,000 on the facts assumed in the above illustration. This range might not, in fact, include the exact dollar cost for every hospital of the type described in the above illustration, but it probably includes the result for most such hospitals. On the assumption that the Blue Cross special service cost was $245,000, Blue Cross would reimburse the hospital $245,000 for covered in-patient special services and $40,000 for covered out-patient special services for a total of $285,000."

present agreement with the merger provisions, the single percentage derived would be approximately eighty-six per cent $\frac{(\text{total costs or } \$500,000)}{(\text{total charges or } \$580,000)}$. Applying this percentage to total charges with respect to Blue Cross members who re-received special services, reimbursement to the hospital would total $292,400, $258,000 of which is related to charges for in-patient services and $34,400 of which is related to charges for out-patient services.

As is obvious from the above, the net effect of the merger provisions is to increase the amount Blue Cross will reimburse a hospital for special services received by members. The parties also agree that vis-a-vis the immediately preceding agreement (see fn. 4), "the net effect of the change is to increase total payments to hospitals by Blue Cross."

As stated above, the commissioner opposes the merger provisions on the ground that they do not result in a rate of payment which either "reflect[s] reasonable hospital costs" or is "based on charges made to the general public, whichever is lower."[5] He rests this conclusion not upon the exercise of a discretionary power to disapprove a rate formula, but rather on his belief that the statute is being violated. The question, then, is whether the commissioner's conclusion is required as matter of law.

The commissioner concedes that the present reimbursement formula can never result in payments which exceed charges to the general public, since members and the public receive identical charges for like services and since the percentage factor applied to member charges can never exceed 100%. He does contend, however, that the present provisions result in payments to hospitals which exceed those costs of a hospital fairly attributable to the services for which the payment is made, and that this constitutes a violation of the statute. He supports this contention by an examination of the effect of merger upon Blue Cross re-

---

[5] Section 5 of c. 176A, set forth above.

imbursement for in-patient special services, considered as a separate category, in the illustration set forth above.[6] But to test the validity of the present agreement in this way is to beg the question. The essence of the merger provisions is that out-patient and in-patient costs of special services are no longer allocated between the two departments in arriving at a reimbursement formula. Thus, if there is nothing in the statute which precludes merger, the reallocation of these costs into their two former categories for the purpose of determining the validity of merger under § 5 is misleading.

The commissioner's answer to this is that the words "reasonable hospital costs," as used in § 5 of c. 176A, have a meaning which compels the testing of any reimbursement formula against the costs and charges of out-patient and of in-patient departments separately considered. In this view, "reasonable hospital costs" means "the cost to the hospital . . . [of] performing *the services* for which reimbursement is to be made" (emphasis supplied). The suggestion here is that the reimbursement rate for any particular category of services, for example for out-patient special services furnished to members, may reflect only costs which were incurred in providing those services.

There is nothing in § 5 of c. 176A which compels so restrictive a definition of "reasonable hospital costs." Section 5 states in this regard: "The commissioner in determining reasonable cost shall give consideration to services provided by the hospital and the costs of comparable hospitals, and may give consideration to depreciation, amortization, interest, occupancy and individual services which are rendered for partial or no payment." Contrary to the commissioner's view, this language suggests that the hospital costs which Blue Cross rates of reimbursement must

---

[6] The commissioner points out that in the illustration, the present agreement with merger results in the payment of $292,400, $258,000 of which is related to in-patient special services. Since the total costs of these services were $400,000 and Blue Cross members received sixty per cent of the services rendered — as derived from the ratio of member charges to total charges — only $240,000 of the costs are fairly attributable to Blue Cross members.

reflect may include those necessary costs of any legitimate and reasonable services which hospitals have traditionally furnished. The reason for such a broad provision is obvious. All of the various costs which a hospital incurs must be recovered in some manner if that hospital is to stay in existence. Thus, to whatever extent Blue Cross under the hospital agreements is precluded from acknowledging and paying a proportionate share of necessary costs, nonmember patients must and will be assessed disproportionately higher rates. It is doubtful that the Legislature intended that § 5 should have such an effect. Nor has the statute been so interpreted in the past. Thus, both the present and prior agreements have included the basic expenses of operating a hospital in their various formulae for determining rates of reimbursement.

That the commissioner's restrictive view of "reasonable hospital costs" is untenable is further revealed by the following facts: "Under prior hospital agreements (since at least 1950) Blue Cross payment for in-patient special services has been made by selecting the lower of costs or charges from the composite costs of all special service departments furnishing services to in-patients and the composite charges of all such departments. Reimbursement for in-patient special services has never been based upon the total of the lower of costs or charges within each in-patient special service department. In certain special service departments in-patient charges were and are greater than costs and in other such departments costs were and are greater than in-patient charges and this has and does vary from hospital to hospital." Thus, the merger principle has long been utilized in respect to the costs and charges of the individual special service departments. If the logic of the commissioner's contention that rates for providing specific services must reflect the reasonable hospital costs of those very services is correct, this use of composite departmental costs might also be invalid under § 5.

Another argument advanced by the commissioner is based upon the agreed fact that the "total cost of out-patient

services performed by the hospitals includes the cost of certain services which are not available as a benefit to Blue Cross members." The commissioner concludes from this that merger results in the reimbursement of hospitals by Blue Cross "for services which are not available to Blue Cross members."[7] This objection is inaccurately directed against merger because it ignores the fact that neither prior agreements, nor the present agreement without the merger provisions, separates these out-patient costs and charges from those which are available to members in arriving at a determination of the Blue Cross rate of payments. It is, moreover, incorrect to say that under the present agreement Blue Cross is paying for the costs of unavailable services. In fact, the rate of hospital reimbursement is merely derived from a cost-charge relationship which is in turn influenced by the costs and charges to the public of these unavailable services.

The commissioner further contends that the merger of special service costs and charges of the in-patient and out-patient departments violates a historical separation between the two. This does not, however, compel the conclusion that the merger provisions are invalid. Concerning the separate treatment of each department under prior agreements, the former commissioner said in approving the merger provisions: "I question the logic of the present separation and find nothing in G. L. c. 176A, § 5 requiring a fragmentation of hospital services in determining reimbursement." This opinion doubtless was based on the fact that under the immediately preceding agreement, " [i]n determining the cost of services rendered on an out-patient basis (and on an in-patient basis as well), the costs of special service departments . . . were required to be allo-

---

[7] Paragraph 35 of the stipulation reads: "The only services offered in the out-patient departments of hospitals which are never covered under the Blue Cross master medical certificate are routine physical examinations; routine prenatal and postnatal care; routine dental care; cosmetic corrections; drugs given to be taken at home for mental or nervous conditions; and medical care in alcoholic clinics. The out-patient services which are never covered by Blue Cross are performed in the same departments as are out-patient services which are covered (except for alcoholic clinics)."

cated between in-patient services and out-patient services because special service departments . . . furnish services both to in-patient and to out-patients.'' The merger provisions have obviated the necessity of allocating the costs of each special service department to either in-patient or out-patient services, a process which, it would seem, could not have been very precise.

Finally, the commissioner objects to merger because the net effect of the present agreement is ''to increase total payments to hospitals by Blue Cross'' and because ''[s]ubstantially all of that increase is attributable to . . . [merger].'' This is not in itself, however, enough to invalidate the merger provisions under § 5. Of course, merger would be more difficult to justify if Blue Cross members did not themselves make substantial use of out-patient facilities, since in this situation it could fairly be described as a device for defraying the high costs of out-patient services rendered to nonmembers by increasing the total payments of Blue Cross for in-patient special services received by members. The fact is, however, that in ''1964 Blue Cross processed 859,793 claims under its basic program, of which 425,702 or almost 50%, were claims for services rendered in the out-patient departments and clinics of hospitals.''

The plaintiffs have argued that the purpose of merger is to encourage hospitals to expand their out-patient facilities and to keep down their charges for services rendered therein. Merger, it is said, will tend to encourage hospitals to substitute out-patient treatment for in-patient treatment wherever possible, since the higher cost than charges ratio characterizing most hospital out-patient departments results under merger in increased Blue Cross payments. It is contemplated that this will in turn reduce total hospital costs and ultimately Blue Cross subscription charges, since generally the overall cost to the hospital of out-patient care is less than that of in-patient care.

As the commissioner correctly points out, there is no guaranty that these developments will materialize under

the present agreement. But this question need not detain us since our function here is limited to measuring the present agreement by the standards set forth in § 5. Having done so, we are of the opinion that the requirement that rates of payment reflect the lower of reasonable costs or charges to the public does not render invalid a hospital agreement in which this standard is measured against a hospital's entire experience in furnishing special services.

## II

### CARE OF THE MEDICALLY INDIGENT.

The other aspect of the present agreement to which the commissioner has objected is the "inclusion of the Net Cost of Care of Medically Indigent . . . as an element of cost in paying hospitals for in-patient care furnished to Blue Cross comprehensive members." His opinion states that as a "matter of law, hospital costs incurred in rendering care to persons who are unable to pay all or part of the charges of the hospital for the services furnished to them may not be included in determining reasonable hospital costs under G. L. c. 176A, § 5." The parties agree that the inclusion of this cost will result in Blue Cross paying "not more than [an additional] $140,000 a year during the term of the present agreement."[8] This cost is included under the agreement in the formula for determining the rate of payment to a hospital for "Routine Services" ("Accommodations") furnished to comprehensive Blue Cross members.

Although Blue Cross had no contracts providing comprehensive coverage until July 1, 1951, over one third of the

---

[8] The term "Net Cost of Hospital Care of Medically Indigent" is narrowly defined in the agreement: "10. The Net Cost of Hospital Care of Medically Indigent shall be (1) the total of 'Free Service — General Patients,' . . . and the actual amounts charged off as bad debts reduced by bad debt recoveries (excluding in each instance any amount shown for 'Other Non-Patient Income') less (a) 1.75% of Total Gross Earnings . . . (excluding any amount shown for 'Other Non-Patient Income'), (b) grants from community funds . . . and (c) Specific Free Bed Income multiplied by (2) the lesser of (a) 100% or (b) the relationship, expressed as a percentage, rounded to the nearest hundredth of a percentage point of (1) 'Total Hospital Expenses,' . . . (excluding any amount shown for 'Other Non-Patient Services') increased by the application of the Factor for Depreciation and Other Expenses to (2) 'Total Gross Earnings' . . . (excluding any amount shown for 'Other Non-patient Income')."

Blue Cross members currently have this type of coverage. Most of these members are in large, well organized groups, and their percentage of all members has steadily increased from 21.6% in 1961 to 35.1% in 1964. "For the hospital year ending September 30, 1963 22% of the in-patient days of Blue Cross members were in-patient days of comprehensive members; for the fiscal year ending September 30, 1964 25% of the in-patient days of Blue Cross members were comprehensive days."

Under prior agreements, the Blue Cross rates of reimbursement both for routine services and for special services provided comprehensive members were determined by various formulae. None of these reflected the net cost to the hospital of furnishing care to the medically indigent. On the other hand, "[m]any hospitals increase the general level of their room and board (routine services) charges to recover amounts which cannot be collected from medically indigent persons." Thus, nonmember patients bear the burden of this cost, along with indemnity subscribers who "may pay this cost directly in the charge made . . . by the hospital for accommodations over the amount reimbursed by Blue Cross."

Much of what we have said in our discussion of the merger provisions above is here relevant, since at issue is whether the costs of care to the medically indigent are reasonable hospital costs within the meaning of § 5 of c. 176A. As we said earlier "reasonable hospital costs" are those incurred in furnishing the kind of services traditionally associated with a hospital, and are not necessarily limited to those costs incurred in providing services available to Blue Cross members. The commissioner argues, however, that since none of these costs may be said to benefit in any way the Blue Cross comprehensive members who will ultimately bear their burden in higher subscription charges, they are not reasonable hospital costs for the purpose of setting the rates of reimbursement for services received by those members.

We disagree with this position. Section 5 directs that "[t]he commissioner in determining reasonable cost shall

give consideration to services provided by the hospital
. . . ."[9]   Nothing in this language requires that the serv-
ices to be considered are limited to services related to the
treatment of Blue Cross members.  Also, the provision for
payment by Blue Cross of some fraction of the indigent
patient cost is merely a limited application of the principle
recognized in prior hospital agreements that a considera-
tion of hospital costs should include a broad recognition of
hospital functions and services.  Thus in "determining
special service costs under the . . . [present] and previous
agreements since 1954, a portion of the [hospitals'] over-
head costs has been allocated to . . . total special service
costs . . . ."  For certain hospitals, this allocation "has
been 25% of the direct special service expense; this per-
centage is increased by 2% if the hospital has a nursing
school, 1% if the hospital has interns and residents, and 1%
if the hospital has a major affiliation with a medical school."

Further indication of the flexibility of the standard set
forth in § 5 is revealed in the other relevant part of § 5
which provides that in determining reasonable costs the
commissioner "may give consideration to depreciation,
amortization, interest, occupancy and individual services
which are rendered for partial or no payment."  Although
the plaintiffs concede that the "individual services . . .
rendered for partial or no payment" here referred to are
services donated by individuals to a hospital and for which
a hospital might include a fictitious cost in determining
Blue Cross reimbursement rates, this is in itself some in-
dication of the scope of permissible hospital costs which
may play a part in arriving at a Blue Cross rate of re-
imbursement.

The commissioner does not deny that the treatment of
indigent patients is an important hospital service.  More-
over, the inference is clear from the fact that nonmember
patients and Blue Cross indemnity patients pay a premium
for routine services that reimbursements from various wel-
fare agencies or from charitable funds do not adequately

---

[9] This language was added to § 5 of c. 176A by St. 1956, c. 406.

cover these costs.   What the commissioner objects to is the fact that the present agreement extends some part of the burden of these costs not to the general public but to a much smaller group (comprehensive subscribers) in the form of higher subscription payments.   There is, however, nothing unreasonable in permitting this group to provide some part of these costs which would otherwise be borne entirely by the nonmembers and indemnity members who are unfortunate enough to become hospitalized.   It is true, moreover, that if the number and overall percentage of comprehensive members continue to increase as they have in the past, the burden of these costs will necessarily devolve upon an ever dwindling group of individuals.   The language of § 5 contains no indication, and we think the Legislature could hardly have intended, that the standard by which hospital reimbursement agreements are measured should necessarily result in this unfair distribution of the costs of a necessary and commendable hospital service.

Finally, the commissioner argues that Blue Cross has violated its contractual obligations to its comprehensive subscribers by agreeing to pay a portion of the cost of care of the medically indigent.   There is, however, nothing in the subscribers' certificates which purports to govern or influence the manner in which Blue Cross reimbursements are to be made.   Part II of this opinion is that of a majority of the court.

A declaratory decree in conformity with this opinion may be entered.

*So ordered.*